UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| CHERRY HILL VINEYARD, LLC, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil No. 05-153-B-W |
| ) | |
| JOHN E. BALDACCI, GOVERNOR ) | |
| OF THE STATE OF MAINE, et al., ) | |
| ) | |
| Defendants. ) | |

**RECOMMENDED DECISION**

In Granholm v. Heald, 544 U.S. 460 (2005), the Supreme Court held that Michigan and New York statutory schemes regulating the direct-shipment of alcohol to state residents violated the Commerce Clause because they afforded privileges to in-state wineries that were denied to out-of-state wineries. With respect to the Michigan law, in-state wineries could be licensed to ship wine directly to consumers, but out-of-state wineries "face[d] a complete ban on direct shipment." Id. at 473-74. With respect to the New York law, both in-state and out-of-state wineries could be licensed to ship wine directly to consumers, but the out-of-state wineries could only obtain a license if they established a distribution operation within the state. Id. at 474-75. Encouraged by Granholm, Cherry Hill Vineyard, LLC, a small Oregon vineyard, and Philip Brooks, a Hampden resident, filed a civil action seeking a declaration that the Maine statutory scheme regulating the sale and movement of wine made by licensed "farm wineries" discriminates against out-of-state farm wineries because it only authorizes wine to be sold "on premises" and prohibits direct deliveries of wine. (Am. Compl., Req. for Relief at 5, ¶¶ A & B.) The matter is before the Court for judgment on a stipulated record. The parties agree that the

matter should be resolved on the stipulated record and that a trial is unnecessary to determine their dispute. For the reasons stated below, I recommend that the Court grant judgment to the defendants.

**Facts**

The statutory scheme at issue is dispersed throughout Title 28-A of the Maine Revised Statutes. The material sections are section 1355(3), which pertains to Maine's farm winery license, and certain sections of chapter 83, §§ 2071-2084, particularly sections 2077 and 2077-B. Also significant is section 706, which requires retailers to verify the age of persons under age 27 to ensure that they are of the legal drinking age in Maine (21 years of age), by means of visual inspection of a photo identification that reveals the purchaser's date of birth. Relevant definitions are supplied in section 2 of the statutory scheme.

Section 1355(3)(A) authorizes in-state and out-of-state wineries producing 50,000 gallons or less annually to obtain a farm winery license. The farm winery license permits the licensee "to sell, during regular business hours, wines produced at the winery by the bottle, by the case or in bulk <u>on the premises</u> of the winery to persons who are not minors." 28-A M.R.S.A. § 1355(3)(B) (Supp. 2005) (emphasis added). If an out-of-state winery is licensed by the State of Maine as a farm winery and has an in-state location, it may obtain an additional license for its in-state location and sell wine direct to consumers at its in-state premises. <u>Id.</u> § 1355(3)(C) (Supp. 2005). If an out-of-state licensed farm winery does not have an in-state location, then its customers must travel to its out-of-state location to directly purchase wine from the farm winery because farm wineries are only authorized to sell wine directly to customers on their premises,

id. § 1355(3)(B) (Supp. 2005), and also because "[a] person may not sell, furnish, deliver or purchase liquor from an out-of-state company by mail order." Id. § 2077-B (Supp. 2005).[1]

Like in-state farm wineries, out-of-state farm wineries may "sell or deliver the product to licensed retailers." Id. § 1355(3)(D) (Supp. 2005). Under this provision, nothing would prohibit Cherry Hill from delivering its wine to Maine licensed retailers, thereby bypassing wholesalers, provided that Cherry Hill first obtained a farm winery license from the State of Maine.

Among the specific acts prohibited in Chapter 83 of Title 28-A is the non-permitted importation of wine into Maine and subsequent transportation of wine within the state in a quantity in excess of four quarts. Id. §§ 2077(1-A) (Supp. 2005). Mere transportation of wine within the state for personal consumption (without importation) is not similarly restricted to the four-quart limit, so long as the wine was purchased in Maine from a retailer licensed to sell liquor for off-premises consumption. Id. § 2077(2) (Supp. 2005). Farm wineries licensed by the state are not subject to this four-quart limit on importing wine, id. § 2077(1-A), but their customers who wish to purchase wine at their out-of-state locations and bring it back to Maine for personal use would apparently be subject to the four-quart limit. The statutory scheme, however, provides that an individual may apply for a permit to import a greater quantity of wine or other liquors for personal use, which application the bureau "may" grant. Id. § 2073.

The parties have stipulated to the following facts, many of which characterize the foregoing statutory scheme:

---

[1] The statutory scheme elsewhere authorizes importation and deliveries of liquor by "for-hire carriers and contract carriers, authorized by the Department of Public Safety, . . . to purchasers of malt liquor or wine from licensees." Id. § 2077(3) (Supp. 2005). The evidentiary record does not reflect the scope of the authorizations issued under this provision such that the Court might be able to discern whether licensed farm wineries can ship their product by "for-hire carriers or contract carriers" following an on-premises sale. For what it is worth, in their answer to the amended complaint, the defendants assert, without citation, "that the laws of the State of Maine prohibit instate wineries from using parcel delivery services to ship wine to consumers within the State." (Answer ¶ 23, Docket No. 12.) Presumably there is a distinction between "parcel delivery services" and the "for-hire carriers and contract carriers" that have been authorized to make direct shipments under § 2077(3).

1.  Plaintiff Cherry Hill Vineyard, LLC ("Cherry Hill") is a family-owned winery located in Rickreall, Oregon. The majority owner is Michael Sweeney.

2.  Cherry Hill holds a federal Basic Permit issued by the Alcohol and Tobacco Tax and Trade Bureau (a bureau of the Department of the Treasury), and a Wine Grower license issued by the State of Oregon, which allow it to manufacture and sell bottled wine in interstate commerce.

3.  On average, Cherry Hill produces approximately 12,000 gallons of wine each year.

4.  Cherry Hill Vineyard intends to sell and deliver wines directly to individuals, restaurants and licensed retailers in Maine if state law restrictions against direct interstate sales and deliveries are removed or declared unconstitutional. It has received requests from Maine residents in the past which it has been unable to fill.

5.  Cherry Hill cannot effectively sell wine directly to consumers in Maine if Maine consumers are required to purchase the wine on the premises of Cherry Hill's Oregon location.

6.  Cherry Hill holds licenses to sell its wine in Arizona, Colorado, Florida, Georgia, Illinois, Massachusetts, New Hampshire, New York, North Carolina, Ohio, Texas, and Washington, and complies with the laws and regulations of those states concerning the sale of wine, including all laws requiring it to remit taxes, and would intend similarly to comply with all laws and regulations of the State of Maine.

7.  The distance from Bangor, Maine, to Rickreall, Oregon, is approximately 2600 miles.

8.  Plaintiff Philip Brooks is an adult resident of Hampden, Maine.

9. Mr. Brooks is a regular purchaser and consumer of wine, including fine and rare wines.

10. Some wines Mr. Brooks wants to purchase are not available in Maine, and presently can only be obtained directly from wineries located outside Maine, such as Cherry Hill.

11. Mr. Brooks intends to purchase, via the internet, telephone, or mail, wine from out-of-state wineries and have those wines delivered to his residence in Maine if state law restrictions against direct interstate sales and deliveries of wine to consumers are removed or declared unconstitutional.

12. As a practical matter, Mr. Brooks would not be able to purchase many of the wines he would like to purchase from out-of-state wineries if he were required to travel to those wineries to make the purchase.

13. Mr. Brooks sometimes visits out-of-state wineries. While he is on the premises of these wineries, Mr. Brooks would like to be able to make spur-of-the-moment purchases of wine in quantities of more than four quarts at a time.

14. Defendant John E. Baldacci is the Governor of the State of Maine.

15. Defendant G. Steven Rowe is the Attorney General of the State of Maine.

16. Defendant Jeffrey R. Austin is the Supervisor of the Liquor Licensing and Inspections Unit in the Department of Public Safety.

17. Defendant Patrick J. Fleming is the Commander of the Special Investigations Unit in the Department of Public Safety and, among other things, oversees the operations of the Liquor Licensing and Inspections Unit.

18. The Department of Public Safety is responsible for administering and enforcing the laws concerning the importation, transportation and sale of wine in Maine, and for administering laws relating to the licensing and collection of taxes on wine sales.

19. Amicus Maine Beer and Wine Wholesalers Association is a nonprofit organization comprised of eight family-owned wholesalers duly licensed in Maine to purchase beer and wine from producers and sell the same to retailers.

20. Under Maine law, wineries that hold a farm winery license are permitted to conduct certain activities, including selling wine directly to consumers on the winery premises, that wineries without such licenses cannot conduct.

21. Out-of-state wineries are eligible to obtain a Maine farm winery license, and the eligibility requirements for obtaining a Maine farm winery license are the same for both out-of-state and in-state wineries.

22. If Cherry Hill obtained a Maine farm winery license, it would be allowed to sell and deliver its wine to licensed wholesalers and retailers (including restaurants) in the State of Maine, but it would not be permitted to sell its wine directly to consumers in the State of Maine. Rather, to sell wine directly to consumers in the State of Maine, Cherry Hill would need to establish a retail location within the State of Maine. Under Maine law, all retail sales of wine to consumers must be made in person.

23. The fee for obtaining a farm winery license is $50 per year.

24. No out-of-state winery has ever obtained a Maine farm winery license.

25. No out-of-state winery has ever applied for a Maine farm winery license.

26. Under Maine law, a person who wishes to bring into the state more than four quarts of wine must first obtain permission from the Department of Public Safety.

27.     To obtain such permission, the person may send a letter (by regular mail, facsimile, or e-mail) providing details regarding the type, quantity, and intended use of the wine that the person proposes to bring into the state.  There is no fee for obtaining permission to bring wine into the state, and permission is generally granted so long as the Department of Public Safety is satisfied that the wine is for personal consumption and will not be re-sold.

*The concern over minors' access to alcohol*

28.     The National Academy of Science is a federally chartered corporation, and it investigates and reports on scientific matters at the request of the federal government.  36 U.S.C. §§ 150301-150304.

29.     In 2002, Congress asked the National Academy of Sciences to develop strategies for reducing underage drinking.

30.     In 2004, after completing their work, the Academy's National Research Council and Institute of Medicine released a report entitled "Reducing Underage Drinking: A Collective Responsibility."  A true and accurate copy of the Executive Summary and Chapter 9 of this report is attached hereto as Exhibit A, and the parties stipulate that the findings, conclusions, opinions and recommendations contained in the excerpted portions of this report are, in fact, the findings, conclusions, opinions and recommendations of the National Academy of Science and constitute admissible evidence that may be considered by the Court and given that weight, if any, that the Court determines is appropriate.

31.     In July 2003, the staff of the Federal Trade Commission issued a report entitled "Possible Anticompetitive Barriers to E-Commerce: Wine."  A true and accurate copy of this report (without the two appendices) is attached hereto as Exhibit B, and the parties stipulate that the findings, conclusions, opinions and recommendations contained in the report are, in fact, the

findings, conclusions, opinions and recommendations of the staff of the Federal Trade Commission and constitute admissible evidence that may be considered by the Court and given that weight, if any, that the Court determines is appropriate.

      32.     On August 3, 1999, the United States House of Representatives held debate on the 21st Amendment Enforcement Act. A true and accurate copy of the transcript of that debate is attached hereto as Exhibit C, and the parties stipulate that the statements reportedly made during the debate were, in fact, made during the debate and constitute admissible evidence that may be considered by the Court and given that weight, if any, that the Court determines is appropriate.

      33.     In September 2003, Wirthlin Worldwide conducted a nationwide telephone survey of 918 adults regarding attitudes toward the availability of wine, beer and spirits over the internet and by mail. The survey was commissioned by Americans for Responsible Alcohol Access, an organization funded primarily by the Wine & Spirits Wholesalers of America.

      34.     When participants in the survey were asked whether they "favor or oppose allowing beer, wine or liquor to be sold directly to consumers over the Internet or through the mail," 77 percent of the participants stated that they were opposed.

      35.     Eight-three percent of participants in the survey "indicate[d] that sales over the Internet should not be allowed because it would give minors easier access to alcohol products."

      36.     When participants in the survey were "asked to consider the impact of Internet sales of beer, wine and liquor on alcohol control/regulation by indicating whether they think Internet sales are a 'good idea' or not, 81 % of the participants stated that making alcohol available over the Internet is not a good idea, thirteen percent stated that it is a good idea, and five percent either did not know or refused to answer.

37. In February, 2000, Wirthlin Worldwide conducted a similar survey of 500 college students and reported that "current awareness and usage of Internet alcohol purchasing is low," finding that only "17% of students are aware of on-line purchasing" and only "2% have actually purchased" alcohol on line. In addition, 5% of the students reported that they knew someone who had purchased alcohol online.

38. In the February 2000 survey, 80% of all students stated that their peers are likely to purchase alcohol on-line if age verification were not required. In addition, 35% of the students under the age of 21 reported that they personally would likely purchase alcohol over the internet if age verification were not required.

39. In Washington, in 2004, Collegians for a Constructive Tomorrow, a student organization at Gonzaga University, conducted an experiment to see whether underage members of the organization could purchase alcohol over the internet. The details of this experiment, including whether any of the purchases were made from wineries, whether the students misrepresented their ages, and the ratio of successful to unsuccessful attempts to make illegal purchases, are not known.

40. The Gonzaga students succeeded in obtaining beer, wine and liquor from various companies doing business on the internet, including Costco.

41. Costco's chief executive officer stated that he was concerned to hear that the underage Gonzaga students were able to purchase wine from his company because Costco requires online purchasers to certify that they are over 21 and it pays an extra fee to its delivery company to get an adult signature and check identification.

42. At the time of the survey, Washington had no law in place requiring wine shipments to be labeled as containing alcohol or requiring an adult signature, nor requiring common carriers who deliver alcohol to verify the age of the recipient.

43. In Massachusetts, in 2004, the Attorney General's office enlisted underage college students in an investigation to see whether the students could obtain alcohol through the internet from online retailers. The students successfully obtained 50 bottles of wine, four six-packs of beer and more than a dozen types of hard liquor. The number of unsuccessful attempts to illegally order liquor was not reported.

44. Following the investigation, the Massachusetts Attorney General's office sued four online retailers for failing to have an appropriate license and for selling to underage buyers. The four retailers were Sherry-Lehmann Wines and Spirits of New York (www.sherrylehmann.com), Wine Globe of San Mateo, Calif. (www.wineglobe.com), Queen Anne Wines and Spirits Emporium, of Teaneck, N.J. (www.queenannewine.com), and Clubs of America of Lakemoor, Ill. (www.greatclubs.com). None was a winery.

45. Also as a result of the investigation, the Massachusetts Attorney General's office referred three online retailers to state liquor authorities for selling to minors. The three retailers were Geerlings & Wade of Canton (www.geerwade.com), Wine.com of San Francisco; and The Wine Messenger of New Rochelle, N.Y. (www.winemessenger.com).

46. The Massachusetts Attorney General's office also stated that three delivery companies – Federal Express, UPS, and DHL – delivered alcohol to minors, sometimes delivering alcohol without asking for proof of age, and sometimes leaving the alcohol on the minors' doorsteps. The Massachusetts Attorney General's office stated that FedEx on four

occasions failed to follow instructions on the outside of the box that it contained alcohol and required a signature of someone over 21.

47. In Michigan in 2000, the Attorney General and the Liquor Control Commission conducted an investigation to see whether an 18-year old could obtain alcohol over the internet. The 18-year old was successful in obtaining alcohol from three separate online retailers. At the time, Michigan did not have a law requiring that alcohol shipments be labeled and that the age of the recipient be verified.

48. The federal government agency with authority to regulate interstate commerce in wine is the Tax and Trade Bureau, formerly known as the Bureau of Alcohol, Tobacco and Firearms. In 2000, it issued a formal ruling denominated ATF Ruling 2000-1. A true and accurate copy of that ruling is attached as Exhibit D.

*Other considerations*

49. There are 11 off-premise retail wine licensees in Hampden, Maine, and 47 off-premise retail wine licensees in Bangor, Maine. Assuming that it complies with all other applicable regulations, Cherry Hill, if it held a Maine farm winery license, would be entitled to sell wine directly to all of those retailers.

50. The only entity other than a farm winery licensee that can sell wine to retail licensees is a wholesaler licensee. A wholesaler licensee must pay $600 for a Maine wholesale license and $100 for a food storage warehouse license. The wholesaler must also maintain a warehouse at which each shipment of wine must be unloaded and inventoried. It must make the wine available to the Department of Public Safety to inspect and inventory to verify tax obligations. The wholesalers must procure a bond to ensure payment of taxes; the cost of the bond depends upon the wholesaler's tax liability, but usually costs thousands of dollars each

year. The wholesaler is also required to pay over the taxes due on the wine by the tenth day of the following month.

   51. A wholesaler in Maine must comply with the bottle bill. As part of those obligations, the wholesaler must pay $500 for a deposit initiator license. It must open each case of wine it receives and place a 15-cent deposit sticker on each wine bottle by hand. In addition, the wholesaler must pay a nonrefundable fee of 3 cents per bottle. This nonrefundable fee is collected from the wholesalers to defray the cost of recycling wine bottles. The wholesaler must also collect, store, and recycle the empty wine bottles.

   52. Maine is the only state east of the Mississippi with a bottle bill that requires a deposit on wine bottles.

   53. When a consumer purchases bottles of wine outside of Maine and brings them into the state, the consumer does not pay the 15-cent refundable deposit or the 3-cent nonrefundable fee. When those bottles are presented to recycling centers in Maine, the consumer usually receives 15 cents per bottle. The Maine wholesaler must collect, store, and recycle those bottles.

## Discussion

The plaintiffs' amended complaint requests the following relief from the Court:

> A. Judgment declaring Maine Rev. Stat. Title 28-A §§ 1361(4), 2077, and 2077-B unconstitutional as applied to preventing out-of-state wineries from selling and delivering wine directly to consumers in the state of Maine, as a violation of the Commerce Clause of the United States Constitution.
>
> B. An injunction prohibiting Defendants from enforcing Maine Rev. Stat. Title 28-A §§ 1361(4), 2077, and 2077-B against direct deliveries of wine from out-of-state wineries, or otherwise prohibiting out-of-state wineries from selling and delivering wine directly to adult consumers in Maine.

(Am. Compl. at 5, Docket No. 11.) As these requests reflect, the plaintiffs' action is narrowly targeted at the statutory scheme to the extent it withholds authorization from remote sales made

online or by phone (sales that are not made on the premises) and prohibits direct deliveries of wine to Maine consumers by mail or parcel post service.[2]

> The Commerce Clause provides that Congress shall have the power "to regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. It has long been understood, however, that this affirmative grant of authority to Congress necessarily encompasses a limitation on the power of states to enact legislation that burdens the flow of interstate commerce. This restriction on the states, known as the dormant Commerce Clause, is not absolute and in the absence of conflicting legislation by Congress, "the States retain authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be affected." Maine v. Taylor, 477 U.S. 131, 138 (1986) (internal quotation marks omitted).

Pharm. Care Mgmt. Ass'n v. Rowe, 429 F.3d 294, 310-11 (1st Cir. 2005). There are several categories of commerce clause disputes and the applicable legal standard depends on which category a dispute falls into. Generally speaking, regulations of the kind at issue here are judged by one of two alternative standards. If it is apparent that the regulation, in purpose or effect, protects in-state commercial interests from out-of-state competition, then strict scrutiny applies. Stated otherwise: "A state statute that has no direct extraterritorial reach but that discriminates against interstate commerce on its face, in purpose, or in effect receives a form of strict scrutiny so rigorous that it is usually fatal." Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 35 (1st

---

[2] In particular, the plaintiffs do not request a declaration that the four-quart limit placed on the importation of out-of-state wine by consumers (§ 2077(1-A)) violates the Commerce Clause. Nor do they request such a declaration concerning discriminatory application of § 2077(3), which authorizes the direct shipment of wine by authorized for-hire carriers "to purchasers of . . . wine from licensees." The absence of any such arguments is presumably a function of the fact that this action presents a purely facial challenge to the legislative failure to condone mail order purchases of wine made remotely through, for example, the Internet. Thus, this action does not present an as-applied challenge in which an individual consumer was frustrated in an attempt to import into or ship into Maine more than four quarts of wine for personal consumption based on the Department of Public Safety's enforcement of § 2077(1-A)(A) or a situation in which an out-of-state licensed farm winery was denied any practical means of shipping to a Maine address, pursuant to § 2077(3), a large order of wine purchased by a customer on its premises. Even if such claims were presented, they are not argued and are not developed in the record. In effect, this action skirts two hypothetical situations in which the dormant Commerce Clause might apply, depending on the kind of record that might be developed, although the defendants appear to believe that the Twenty-first Amendment and 27 U.S.C. § 124 condone differential treatment of in-state and out-of-state wine with respect to importation and transportation within the State, even if the out-of-state wine comes from a licensed farm winery. (Defs.' Brief at 5 n.5.)

Cir. 2005). On the other hand, if the regulation treats the relevant in-state and out-of-state interests the same or places only indirect or incidental burdens on interstate commerce, those burdens will be constitutional so long as they are not "clearly excessive" in relation to "putative local benefit." Id. (quoting Pike v. Bruce Church, 397 U.S. 137, 142 (1970)). See also Philadelphia v. New Jersey, 437 U.S. 617, 624 (1978) ("The crucial inquiry, therefore, must be directed to determining whether [the regulation] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental."). The party who challenges the state regulation bears the burden of demonstrating which level of scrutiny applies. See Alliance of Auto Mfrs., 430 F.3d at 35. When that party bases its challenge exclusively on an assertion that strict scrutiny applies, it is not entitled to have the regulation subjected to the less-searching Pike standard. See id. (treating a Pike analysis as "expressly waived" because none of the challenger's claims asserted that the regulation at issue could not withstand a Pike analysis). In this case the plaintiffs assert that the strict scrutiny standard applies because the statutory scheme bars their product from entering the state and/or is protectionist in effect, complaining as follows:

> Out of state wineries may not sell wine directly to consumers in Maine, nor may they ship wine into Maine, nor may Maine residents carry home wine bought from out-of-state sources. As a practical matter, the only way out-of-state wineries may sell their wine in Maine is to use a Maine wholesaler. In-state wineries are not subject to these restrictions, but may sell wine directly to the public without using a wholesaler. This scheme discriminates against and burdens interstate commerce, gives local wineries preferential access to the market, and protects the economic interests of local wholesalers, in violation of the dormant Commerce Clause.

(Pls.' Brief at 1-2, Docket No. 19.) Notably, the plaintiffs do not articulate a Pike analysis anywhere in their primary brief and expressly disavow the appropriateness of any application of the Pike test in their reply brief (Docket No. 24). As a consequence, if the Court should conclude that the statutory scheme is not protectionist in purpose or effect, then there would be

no need to balance any incidental or indirect burdens on interstate commerce against the "putative local benefits" identified in the stipulated record.  Alliance of Auto Mfrs., 430 F.3d at 35.

**A.    The plaintiffs fail to demonstrate the existence of a local market in which local farm wineries are authorized to participate and from which out-of-state wineries are excluded.**

As the above-quoted argument from the plaintiffs' brief reflects, they contend, among other things, that the statutory scheme bars wine produced by out-of-state farm wineries from the Maine marketplace "as a practical matter," unless it is brought to market through a licensed wholesaler.  This contention is entirely at odds with the stipulated record, which reflects the parties' agreement that, "[i]f Cherry Hill obtained a Maine farm winery license, it would be allowed to sell and deliver its wine to licensed wholesalers and retailers (including restaurants) in the State of Maine." (Stip. R. ¶ 22.) The statutory scheme supports this stipulation. See 28-A M.R.S.A. § 1355(3)(D) (Supp. 2005) (authorizing licensed farm wineries to sell directly to retailers).  Accordingly, it would be inappropriate for the Court to apply strict scrutiny on the basis of a finding that out-of-state farm wineries are excluded from the retail market.  The parties have stipulated that out-of-state farm wineries have access to the retail market.  As for a "direct delivery" or "mail order" market, the plaintiffs' action is not impeded by the stipulated record, but it is also not supported by it.  The plaintiffs fail to demonstrate the existence of any lawful mail order or direct delivery market in Maine that any farm wineries may participate in.

**B.    The plaintiffs fail to demonstrate that on-premises sales restriction is protectionist.**

The thrust of the plaintiffs' challenge is that the "on the premises" restriction applicable to direct consumer sales by licensed farm wineries, id. § 1355(3)(B), is protectionist in effect because Cherry Hill cannot directly sell its wine to a consumer while that consumer is physically

15

present in Maine unless it establishes operations in Maine, whereas farm wineries situated in Maine can. According to the plaintiffs, this practical consequence of Cherry Hill's remoteness from Maine means that, if Maine is going to permit farm wineries to make on-premises direct sales to consumers, then it is unconstitutional for the State to prohibit or fail to authorize out-of-state farm wineries to sell directly to Maine consumers from out-of-state locations by means of mail order.[3] I conclude that the statutory scheme does not set up a system that would discriminate against out-of-state farm wineries (if any existed) because the on-premises or "face-to-face" restriction applies equally to in-state and out-of-state farm wineries and because the plaintiffs fail to present evidence of any situation in which an in-state farm winery could lawfully ship its product by mail to a Maine consumer. This conclusion is entirely consistent with the holding of Granholm, which invalidated the Michigan and New York schemes solely because they created a direct shipment market and afforded access only to enterprises having an in-state presence. 544 U.S. at 475-76.[4] Unlike the records compiled regarding the statutory schemes at issue in Granholm, the plaintiffs in this case have failed to demonstrate the existence in Maine of

---

[3] The plaintiffs also point to the § 2077(1-A) four-quart limit as a prohibition that contributes to giving local wineries "preferential access to the market" (Pls.' Brief at 4), because customers like Mr. Brooks cannot make spur-of-the-moment bulk wine purchases when traveling out of state (id. at 3-4) but could make such purchases from in-state licensed farm wineries. As indicated in the body of the recommendation and in the preceding footnote, the plaintiffs have not requested in their claim for relief that the Court declare the four-quart limit to be unconstitutional. They ask only that the Court declare unconstitutional and enjoin the defendants from enforcing the statutory scheme to the extent it prohibits out-of state wineries like Cherry Hill from selling and delivering wine to consumers in the State of Maine by means of off-premises mail order transactions. (See Am. Compl. at 5, ¶¶ A & B.) In fact, the defendants squarely assert in a footnote to their primary brief that they do not understand the plaintiffs to be making any claim that the four-quart limit is unconstitutional. (Defs.' Brief at 5 n.5.) The plaintiffs do not challenge that assertion in their reply brief (Docket No. 24). As a consequence, the matter is neither pleaded nor argued.

[4] See also Granholm, 544 U.S. at 473-74 (citation omitted):

> The discriminatory character of the Michigan system is obvious. Michigan allows in-state wineries to ship directly to consumers, subject only to a licensing requirement. Out-of-state wineries, whether licensed or not, face a complete ban on direct shipment. . . . .
>
> The New York regulatory scheme differs from Michigan's in that it does not ban direct shipments altogether. Out-of-state wineries are instead required to establish a distribution operation in New York in order to gain the privilege of direct shipment. This, though, is just an indirect way of subjecting out-of-state wineries, but not local ones, to the three-tier system.

any mail order local market that is afforded to in-state farm wineries and denied to out-of-state farm wineries.[5] I conclude that this shortcoming in the record precludes a strict scrutiny challenge because there is no basis for the Court to find that the Maine scheme is protectionist in purpose or effect.

C. **The on-premises restriction readily passes a Pike analysis, although no such analysis is called for because that question has been waived.**

The primary thrust of the plaintiffs' challenge is that out-of-state wineries are discriminated against because, due to their remoteness from the State of Maine, they do not have, as a practical matter, "direct" access to Maine customers except by means of long-distance (non-face-to-face) transactions. (Pls.' Brief at 3.) Although it seems highly peculiar, they actually appear to be arguing that, because consumers can readily walk into licensed retailers in the State of Maine, out-of-state retailers, licensed or not, must be permitted equal access through the Internet or telephone. (Id. at 3-4.) In other words, if local retailers can make direct sales that are

---

[5] The plaintiffs only make reference to § 2077-B on one occasion (Pls.' Brief at 2), and the defendants make no mention of it at all. The provision has the appearance of a protectionist purpose or effect because it prohibits individuals from making mail order sales and purchases of liquor exclusively "from an out-of-state company," without similarly prohibiting mail order sales and purchases from in-state companies. However, the record demonstrates that neither in-state licensed farm wineries nor out-of-state licensed farm wineries are authorized to sell their product direct to consumers except by means of sales made on premises and the record fails to disclose any mail order market or particular transactions that are available to in-state farm wineries but not out-of-state farm wineries. The latter point is crucial, in my view, because unless the plaintiffs can point to some niche market or transactions that can only be engaged in by in-state farm wineries, the prohibition against mail order sales and purchases from out-of-state companies does not result in local protectionism. Given the language of Section 2 of the Twenty-first Amendment ("The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."), the mere appearance of a facially discriminatory provision such as § 2077-B does not trigger strict scrutiny under the Commerce Clause unless it actually results in protectionism. Granholm, 544 U.S. at 484 (indicating that the authority granted the states under the Twenty-first Amendment may be exercised to regulate importation so long as a state does not "pass nonuniform laws in order to discriminate against out-of-state goods") & 489 ("State policies are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent.").
   I make this aside because, based solely on my review of the statutory scheme, I cannot say that I am persuaded on this record that direct shipment of wine to consumers is not authorized, provided that it is preceded by a sales transaction made at a licensee's premises. See 28-A M.R.S.A. § 2077(3); but also compare 28-A M.R.S.A. § 1355(3)(B) (authorizing only on-premises sales to consumers) with § 1355(D) (authorizing both sale and delivery to licensed retailers). The plaintiffs' failure to develop any issue might suggest that none exists or that they are pursuing a nation-wide effort to expand the mail order market for wine, without really delving into the particularities of the Maine statutory scheme.

17

readily feasible, as a practical matter, then out-of-state retailers must be afforded a similarly practical means of entering into direct transactions with Maine consumers. (See id. at 4: "This statutory scheme has the practical effect of prohibiting direct sales by out-of-state wineries while allowing them to be made by in-state wineries, which is discriminatory.") I do not think this proposition really deserves any protracted discussion. If the requirement of "face-to-face" or "on-premises" transactions were applied to an innocuous article of interstate commerce such as clothing, which is not subject to any age restriction or other public health restriction (let alone the Twenty-first Amendment), then it would be difficult to understand what rational basis might exist for prohibiting mail order purchases. But here the patently obvious circumstances are that the subject matter of the statutory scheme is wine, wine is an alcoholic beverage that is contraband when placed in certain minors' hands, and the State has concluded that mail order transactions cannot reliably be policed in order to protect certain minors from themselves. It is not for this Court to second-guess that policy determination in favor of the plaintiffs' free market perspective. Were it the case that Maine, like New York or Michigan, had concluded that the risk to minors was tolerable and had authorized in-state retailers to sell alcohol to consumers in Maine by mail order, then it would follow that Maine could not bar out-of-state retailers from participating in that market without running afoul of the Commerce Clause. That is precisely the holding of Granholm. But because Maine has not authorized any local retailers to fill orders for wine that are not made on the retailer's premises by individuals of legal drinking age and because the Commerce Clause does not require Maine to permit mail order purchases of wine simply because it is the most practical means of affording remote, out-of-state wineries with access to Maine consumers, the on-premises restriction on sales simply does not impose any cognizable

18

burden on interstate commerce that could possibly outweigh the putative local benefit of regulating minors' access to alcohol.

## Conclusion

For the foregoing reasons I recommend that the Court enter judgment in favor of the defendants against the plaintiffs' Commerce Clause challenge to Maine's prohibition against direct shipment of wine, in effect granting the defendants' request for judgment on the stipulated record (Docket No. 22) and denying the plaintiffs' comparable request (Docket No. 19).

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

July 27, 2006